**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | | |
|---|---|---|
| **DAVID HENDERSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:06cv0840** |
| | ) | |
| **WESTERN EXPRESS, INC.,** | ) | **Judge Thomas A. Wiseman, Jr.** |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION**

Plaintiff David Henderson filed this action alleging unlawful race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"); and the Tennessee Human Rights Act, Tenn. Code Ann. § 4-21-101 ("THRA").   Discovery has been completed and Defendant Western Express, Inc. ("Western") has now filed its Motion for Summary Judgment and supporting Memorandum, in which it contends that there are no disputed issues of material fact and it is therefore entitled to judgment in its favor as a matter of law.

As indicated below, the evidence presented in this case is insufficient to permit the Court to determine that either party is entitled to judgment as a matter of law.   The defendant's motion for summary judgment will therefore be denied.

**I.      STANDARD OF REVIEW**

Summary judgment is warranted when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c). "Summary judgment is appropriate if a party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case."  *Beecham v. Henderson County*, 422 F.3d 372, 374 (6th Cir. 2005).

**II.     STATEMENT OF FACTS**

Viewed in the light most favorable to the plaintiff, the pertinent facts are as follows:

Henderson was employed by Western as a third-shift diesel mechanic from October 21, 2003 until he was laid off on September 7, 2005.  Prior to going to work for Western, Henderson had at least

seven years of experience as a diesel mechanic, and he made $14.00 to 16.00 per hour working for Roadway prior to going to work for Western. (Plaintiff's Dep. at 15-16; *see also* Doc. No. 48-4 (Pl.'s Application for Employment with Western); Doc. No. 48-6 (Pl.'s Separation Notice – Unemployment).) Western does not dispute that Henderson was qualified to do his job.

When Henderson applied to work at Western, he requested $14.00 or 14.50 per hour. He was told, however, that Western's most senior and most experienced mechanics made that much and that Western was not prepared to offer him that much at the beginning as it would create a conflict of interest for Western. Instead, he was offered the job at $12.00 per hour to start and promised a one-dollar raise after ninety days. He did receive the raise—to $13.00 per hour—effective March 8, 2004, almost five months after he was hired. (*See* Doc. No. 48-3, Ans. to ¶ 6; Doc. No. 48-5 (Payroll Notice).)

Henderson alleges that that at least three white mechanics employed by Western during Henderson's tenure, if not more, were less senior and had less experience as mechanics than he but earned $14.00 or more per hour. On January 11, 2005, Henderson filed employment discrimination charges with the EEOC based on the allegations that his salary was lower than that of other mechanics at Western with comparable experience and seniority and that he did not receive a pay raise after ninety days as he was allegedly promised at the time he was hired. Although Henderson apparently believed he had not received a raise at all, it is undisputed now that he had received the raise to $13.00 per hour approximately ten months before he made a claim to the EEOC.

Henderson was laid off in September 2005, approximately eight months after filing charges with the EEOC. On the same day Henderson was laid off, three other mechanics, Adam Burney, Robert Heady and James Greer, were also laid off. (Doc. No. 48-2, at ¶ 6; Doc. No. 48-20, at Ans. to ¶ 12.) The other three mechanics were all white. (*Id.*) The reason given for Henderson's and the other three employees' discharge was "Permanent Lack of Work." (*See, e.g.*, Doc. No. 48-6.) Western maintains that it underwent a reduction in work force that was necessitated by its having replaced nearly 1000 of its older trucks with new ones in late 2004 and early 2005. The newer trucks required less mechanical maintenance, and therefore fewer mechanics, than the older trucks they replaced. As discussed in greater detail below, Western claims that the decision as to which employees to lay off was based on the employees' efficiency and performance. Henderson argues that there is no empirical evidence in the

record to support Western's claim that he was less efficient than other employees or that his work performance was in any way lacking.

In addition, while Henderson does not dispute that Western had replaced a large number of its tractors by the end of the first half of 2005, he does dispute that Western had a need to lay off mechanics in September 2005. He points out that during the fourth quarter of 2005, after his employment was terminated, Western placed four advertisements (on October 30, 2005; November 6, 2005; November 13, 2005; and November 20, 2005) for employment with Western as a mechanic. According to Clarence Easterday, the same ad was run on those days but by mistake. That advertisement that was supposed to run from August through November was for a "break down/warranty position," an office job that involves taking telephone calls reporting break downs and handling warranty issues. (Doc. No. 40-5, at ¶ 8.) According to Western's answer to Plaintiff's interrogatory, that ad was "already in place prior to anticipated lay off." (Doc. No. 48-20 (Answer to Interrog. 10).) Western further contends no other ads for mechanics were run until August of 2006.

Western also maintains that despite the advertisement that ran mistakenly in the fall of 2005, "no mechanics were hired in 2005 after complainant was laid off." (*Id.*) Other documentation produced by the parties shows, however, that Western did hire a mechanic in the fall of 2005 about six weeks after Henderson's termination, just not a full-time mechanic. (*See* Doc. No. 48-20, at 5 (Answer to Interrog. 11), and at 12 (Attachment to Def.'s Resp. to Pl.'s 1st Set of Interrogs.), indicating that Alvin Toler was hired as a part-time mechanic on October 13, 2005; he only worked a few days and was replaced by Christopher Jones on November 17, 2005.)

Henderson filed a second EEOC charge on January 9, 2006 based on his discharge. On May 30, 2006, the EEOC issued right-to-sue letters concerning both of Henderson's charges.

## III.    DISCUSSION

Although the issues are not clearly framed or argued by either party, it appears that Henderson bases his employment discrimination claims on allegations that he was paid less, and received fewer raises, than white mechanics with comparable or lesser experience and seniority than he had. He also appears to be claiming that the discharge itself was discriminatory in that he was treated differently from

other similarly situated white employees. Further, Henderson claims that he was fired in retaliation for having brought his first EEOC charge in January 2005.

### A.      Henderson's Discrimination Claims

The plaintiff here does not assert that he has direct evidence of racial discrimination. When a plaintiff presents only indirect evidence of disparate treatment based on race, a Title VII claim is analyzed under the familiar *McDonnell Douglas* burden-shifting approach. *Clay v. United Parcel Service, Inc.*, 501 F.3d 695, 703 (6th Cir. 2007).[1]  " ' On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry.' " *Macy v. Hopkins County Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). Because the THRA "provide[s] for execution within Tennessee of the policies embodied in the federal civil rights statutes[,] . . . an analysis of claims under the THRA is the same as under Title VII of the Federal Civil Rights Act." *Lynch v. City of Jellico*, 205 S.W.3d 384, 399 (Tenn. 2006) (citations omitted).

Under both the state and federal statutory schemes, the plaintiff must first, of course, establish a *prima facie* case of racial discrimination. *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003). There are many "context-dependent ways by which plaintiffs may establish a *prima facie* case." *Macy*, 484 F.3d at 365 (emphasis removed). "The key question is always whether, under the particular facts and context of the case at hand, the plaintiff has presented sufficient evidence that he or she suffered an adverse employment action under circumstances which give rise to an inference of unlawful discrimination." *Id.*

In the case at bar, both parties assume that the applicable elements include proof that (1) plaintiff is a member of a protected class; (2) he was qualified for his job and performed it satisfactorily; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated individual outside his protected class. *Cf. Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001). If the plaintiff succeeds in establishing a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for the employment decision.

---

[1] The parties here do not distinguish between Henderson's Title VII and § 1981 claims. The Court therefore will not address the differences between them.

*Braithwaite*, 258 F.3d at 493 (internal quotation marks omitted). The Supreme Court has defined the defendant's burden as follows:

> The burden that shifts to the defendant . . . is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, *through the introduction of admissible evidence*, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.

*Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55 (1981) (internal citation omitted; emphasis added).

Finally, if the defendant meets its burden of production, the burden shifts back to the plaintiff to show that the reason put forth by the defendant is pretextual, which can be done " 'by showing that the proffered reason (1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.' " *Johnson*, 319 F.3d at 866 (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).

### *(1)      Henderson's Claim Based on Disparate Pay*

The parties do not dispute that Henderson, as an African-American, is a member of a protected class and therefore satisfies the first element of his *prima facie* case of discrimination. Moreover, Western concedes that Henderson was qualified for the job of diesel mechanic. (*See* Doc. No. 51, at 2 ("All mechanics were qualified or they would not have been working for the Defendant.").) Western, however, denies that Henderson has established that he suffered an adverse employment action and assert that, even assuming he did, he was not treated differently from similarly situated employees who did not belong to the plaintiff's protected class.

### *(a)      Whether Henderson Suffered an Adverse Employment Action*

In articulating his *prima facie* case, Henderson argues only that his discharge constituted an adverse employment action, but in arguing about whether he was treated differently than similarly situated employees, he brings in the issue of pay disparities. For purposes of this motion for summary judgment and despite the failure of either party to articulate much of an argument for or against summary judgment on this issue, the Court presumes that the plaintiff intended to argue that he suffered an adverse employment action when Western failed to pay him as much as he asked for when he was hired;

failed to give him a pay raise immediately after his first ninety days; and thereafter failed to give him any additional pay raises or to pay him as much as it paid other mechanics with comparable experience and seniority.

Title VII provides, in pertinent part, that "It shall be unlawful for an employer . . . to discriminate against any individual with respect to his compensation . . . because of such individual's race . . . ." 42 U.S.C. § 2000e-2(a)(1). Generally speaking, to establish discrimination based upon a claim of unequal pay for equal work, the plaintiff must prove that persons not members of the plaintiff's protected class received more wages for substantially equal work. *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). With respect to those mechanics who Henderson claims were paid less than he was but received proportionately higher raises, Henderson has obviously not established that those mechanics were paid *more* than he was for similar work.[2] Any claim based on comparison with those mechanics therefore fails.

Henderson also points to evidence in the record showing that he received less money per hour to start than mechanics with comparable experience and that he subsequently failed to receive pay raises commensurate with those of comparable mechanics, such that mechanics who had less or comparable experience but less seniority than he had were paid more than he was. In other words, Henderson has created an issue of fact as to whether he was receiving unequal pay for substantially equal work and has therefore established the adverse employment action element of his *prima facie* case for purposes of Defendant's motion for summary judgment, assuming that the employees to whom he seeks a comparison were similarly situated for purposes of such a comparison, as discussed in greater detail below.

---

[2] Specifically, Henderson alleges that Adam Burney and Kevin Stewart, who had less experience and received less pay per hour to start than Henderson, received pay raises at much higher percentages than Henderson's pay increase. Henderson also complains that Burney and Stewart received their first raises less than 90 days after their initial hire dates, while Henderson did not receive a raise until more than 130 days after his hire date. However, Burney and Stewart were never paid more per hour than Plaintiff. Burney's starting rate of pay was only $10.00, while Plaintiff's was $12.00. Burney received a pay raise of $.50 approximately ninety days after his hire date, but he was still not making more money than Henderson at that point. His pay rate was eventually increased to $13.00, the same as Henderson's, but it was never higher. Moreover, Burney was discharged from Western at the same time as Henderson, so he was obviously not treated more favorably. Similarly, Kevin Stewart was hired on August 8, 2003, just two months before Henderson. He had four years of prior experience and was initially paid $9.00 per hour. He received a pay raise up to $12.00 per hour within ninety days of his hire date, but he still was not making more money than Henderson at that point. He eventually received a raise up to $12.50 per hour, less than Henderson's $13.00, and he was still being paid $12.50 per hour at the time his employment with Western ended in January 2006. (*See* Doc. No. 40-4, at 6; Doc. No. 43-1, at 2.)

(b)     *Whether Henderson Was Treated Differently Than Similarly Situated Non-Black Employees*

The Sixth Circuit has stated that, in showing that he was treated differently than similarly situated co-workers who did not belong to his protected class, "the plaintiff must show that the 'comparables' are similarly-situated in all respects," absent other circumstantial or statistical evidence supporting an inference of discrimination. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). That statement has not been narrowly construed, however. The Court has subsequently explained that a plaintiff is simply "required to prove that all of the *relevant aspects* of his employment situation were 'nearly identical' to those of [the non-minority's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 802 (6th Cir. 1994)).

The "comparable" employees to whom Henderson points are Jimmy Parrott, Perry Kirkman, and Jeffrey Rice, all of whom Henderson claims were less senior and less experienced than he but were paid more than he to start and received pay raises to $14.00 or more per hour soon after they were hired, while Henderson was still being paid $13.00 per hour.

With respect to starting pay, Henderson has shown that Perry Kirkman, hired approximately one year after Henderson in September 2004, started at $13.00 per hour and had about seven years prior experience as a mechanic (approximately the same as Henderson's seven to nine years of experience). Jimmy Parrott was hired by Western in October 2004 at the starting rate of $14.00 per hour. He claimed to have five or six years of experience, but his job application indicates he had been in jail for the five years prior to going to work for Western. (Doc. Nos. 48-16 and 48-17.) Henderson was making $13.00 per hour by that time as well. The question is whether these other employees were "similarly situated" for purposes of Henderson's *prima facie* case relating to starting pay.

Because these employees were hired a year later than Henderson, the Court cannot conclude that they were similarly situated in all *relevant* respects for purposes of comparing initial rates of pay. The time frame during which an employee is hired is certainly relevant to comparisons between employees' starting rates of pay. A year is not a tremendous time difference, but by then the going rate in the area for experienced mechanics might have increased and Western's demand for mechanics might have been changed.

As for Henderson's claims that he did not receive pay raises commensurate with those of comparable employees, the facts indicate as follows:

> (1) Rice had 7 years prior experience when he was hired on June 2, 2003, received $11.40 per hour initially (less than Henderson), and received his first pay raise in October 2004 (much later than Henderson), up to $13.00 per hour (the same as Henderson). Rice eventually received a raise to $15.00 per hour but the record does not indicate when that occurred or whether Rice ever was paid more than Henderson while Henderson was still employed by Western. The evidence is insufficient to permit the conclusion that Rice was treated more favorably than Henderson, regardless of whether they were similarly situated.

> (2) Jimmy Parrott had slightly less experience as a diesel mechanic and was hired a year after Henderson, so he also had less seniority. He was being paid $15.00 per hour after only six months of employment (he quit after six months), at a time when Henderson was still only receiving $13.00 per hour and had been working for the company for eighteen months. Henderson and Parrott were similarly situated at that point in that they were both working as diesel mechanics for Western and had comparable levels of experience and seniority, with Henderson having slightly more of both. Parrott was clearly treated more favorably than Henderson, since he was making $2.00 more per hour.

> (3) Perry Kirkman likewise had approximately the same level of experience as Henderson and was hired a year later than Henderson, but was making $14.00 per hour ($1.00 more than Henderson) within six months of his employment (he quit after six months). Kirkman was comparable to Henderson in all relevant respects, and he was apparently treated more favorably in terms of pay.

(*See* Doc. No. 43-1.)

In other words, Henderson has established a *prima facie* case of discrimination with respect to his rate of pay as compared to that of Kirkman and Parrott.[3] Next, the Court must consider whether Western has articulated a legitimate, non-discriminatory reason for the disparity in the amounts paid to Henderson as opposed to Kirkman and Parrott.

> (c)  *Western's Legitimate Non-Discriminatory Reasons for Its Actions*

Western, though the affidavit of Clarence Easterday, then Vice President of Operations for Western, argues that Henderson "could have been earning more money if he had worked harder." (Doc. No. 40-4, at ¶ 6.) Easterday claims that in the nineteen weeks prior to Henderson's pay-raise in March 2004, he averaged 38.7 hours per week. During the nineteen weeks after his pay raise, he averaged 32.2 hours per week, and worked 40 hours in only three of those weeks. Easterday also states that

---

[3] Western claims that Parrott, "[i]n attendance and work ethic, . . . was not similar to Plaintiff." (Doc. No. 51, at 3.) The Court finds that a jury issue is presented as to whether Plaintiff's apparently minor and temporally isolated attendance issues were sufficiently material to justify the failure to increase his pay rate despite his level of experience.

Henderson was hired to work full time, forty hours per week, with overtime available.  Easterday claims that Henderson "could have been earning more money if his performance warranted it and he had worked harder."  (*Id.*)  However, beyond the obvious fact that if Henderson had worked more hours, he would have made more money, regardless of whether he received a raise, Easterday does not state that Henderson would actually have received a raise if he had worked more hours.  Moreover, there is no evidence in the record indicating how many hours per week other employees worked, or identifying who made the decision to award pay raises or what criteria were considered.  None of the employee personnel files produced contains a performance evaluation.  Thus, while Henderson's employment file indicates he had absenteeism issues in April and May 2004 and personal problems that required some time off in the spring of 2005, there is no indication in the record as to what role these issues should or might have played in pay decisions.  The only effort Western makes to explain the pay discrepancy is to argue that Henderson was not "similarly situated" to either Parrott or Kirkman because those employees' personnel files do not contain any indication that they had absentee issues.  However, those two employees also quit within approximately six months of being hired.  Henderson's absentee issues were not documented until he had been employed by Western for more than six months.

The Court finds that Western has proffered sweeping, conclusory statements and the argument of counsel, but no admissible evidence that would support its purported legitimate, non-discriminatory reason for failing to pay Henderson as much as it paid Kirkman and Parrott.  Western has failed to meet its burden of production on that issue.  *Cf. Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255 (1981) (holding that, to meet its burden of production, "the defendant must clearly set forth, through the introduction of *admissible evidence*, the reasons" for its decision (emphasis added)).  Because of its failure to point to admissible evidence in the record to support its position, Western's motion for summary judgment as to Henderson's discrimination claim based upon unequal pay fails.

### (2) Henderson's Discrimination Claim Based on his Termination

Based on his response to the defendant's motion, it appears that Henderson intended to state a discrimination claim based upon his discharge as well as a retaliation claim based on that event.  The *prima facie* elements for that theory of recovery are related to the fact that the termination was allegedly the result of a reduction in force.  The Sixth Circuit has held that a plaintiff who is discharged as part of a

reduction in force cannot establish a *prima facie* case of discrimination merely by showing that he was a member of a protected class, he was qualified to perform the job, and he was discharged. *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464 (6th Cir. 1990). As the Court explained:

> When work force reductions by the employer are a factor in the decision, "the most common legitimate reasons" for the discharge are the work force reductions. By showing the other elements of a *McDonnell Douglas* case, a plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge and therefore does not make out a *prima facie* case *absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.*

*Id.* at 1465 (emphasis added; citations omitted). Thus, in order to make out a *prima facie* case, a plaintiff must show something more, such as, for example, that he was replaced by a person outside his protected class, *id.* at 1465 n.9, that he possessed qualifications superior to those of a co-worker outside his protected class working in the same position as the plaintiff, *id.* at 1466, or that the reduction in force itself was pretextual, *id.* at 1465 n. 10. "The guiding principle is that the evidence must be sufficiently probative to allow a factfinder to believe that the employer intentionally discriminated against the plaintiff . . . ." *Id.*; *see also Jones v. Fluor Fernald, Inc.*, 216 Fed. Appx. 461, 462–63 (6th Cir. 2006) (applying *Barnes* to affirm summary judgment for the defendant in a case involving alleged race discrimination in the context of a reduction in force).

The Court has also defined what constitutes a "true work force reduction case":

> A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

*Barnes*, 896 F.2d at 1465.

In this case, Henderson does not dispute that Western replaced nearly 1000 of its older tractors with brand new ones in 2004 and 2005 and, as a result, needed fewer mechanics to maintain the fleet. (Doc. No. 40-5, at ¶ 5.) In addition, although Henderson disputes Western's contention that it underwent a true reduction in force by pointing out that Western ran advertisements for mechanics during the fall of 2005, after Henderson was terminated, Western has presented proof that these ads were run in error and

that, in any event, it did not hire any additional full-time diesel mechanics until the fall of 2006.[4] Henderson has not demonstrated that Western's claim that it required a reduction in force for business reasons was pretextual.

However, in support of his claim that he was improperly singled out for termination, Henderson points to Western's lack of empirical evidence to support its proffered reason for choosing Henderson for lay-off. Specifically, the only evidence introduced by Western to support Henderson's termination is contained in the affidavits of Clarence Easterday. In his second affidavit prepared for submission to the EEOC, Mr. Easterday stated:

> The four mechanics laid off were those mechanics deemed to be least efficient in terms of both job productivity and attendance. . . .
>
> The layoff was based solely upon efficiency of the mechanics. The least efficient four (4) were laid off. The only criteria [sic] was performance. The factors to evaluate performance were ability to do the work, time taken on the work, and attendance at work.

(Doc. No. 40-5, at ¶¶ 6, 10.) Easterday does not state anywhere in his affidavit that he has personal knowledge of how the decision to terminate Henderson was made. In fact, Western has presented no admissible evidence at all to indicate: (1) what performance standards the mechanics were supposed to meet; (2) the existence of any written performance evaluations of any of the employees' performance; (3) who determined the employees' qualifications; (4) Henderson's failure to meet performance requirements *or* his relative performance compared to that of other employees; or (5) who made the decision to terminate Henderson. In other words, although Easterday claims that performance dictated the decision of whom to terminate, there is no admissible evidence in the record regarding the quality of Henderson's performance in contrast to that of other employees.

Similarly, with respect to attendance as opposed to quality of performance, Clarence Easterday testified in an earlier affidavit that he had examined Henderson's attendance record and determined that

---

[4] Western did hire a part-time mechanic in October 2005, approximately one and a half months after Henderson's termination. That new hire worked for only a few days and was replaced after he quit by another part-time employee. Both these new hires were white. Because the new position was part-time and therefore would not have been eligible for benefits, it is likely not comparable to the position from which Henderson was terminated. *Cf. Ahmed v. N.C. Servo Tech. Corp.*, 1996 WL 426489, *8 (E.D. Mich. 1996) (suggesting that a part-time employee who was not paid benefits likely could not be considered to replace a terminated full-time employee). In any event, Henderson does not address the fact that Western hired a part-time mechanic in October 2005 nor argue that this hire creates an issue of fact as to whether Western engaged in a true reduction in force.

Henderson had averaged 34 hours per week throughout the course of his employment with Western as of April 2005 (approximately five months prior to his termination). (Doc. No. 40-4, at ¶ 6.) Western, in its Memorandum in support of summary judgment, also points out that Henderson's personnel file contained disciplinary reports indicating he had attendance issues in the spring of 2004, approximately eighteen months prior to his termination. Notwithstanding, there is no evidence in the record that the employees who were retained worked more hours or were more punctual than Henderson.

In sum, the Court concludes that Henderson has established a *prima facie* case of discrimination based on his termination, but that Western has failed to proffer any admissible evidence in support of its reasons for singling out Henderson for termination. *See Burdine*, 450 U.S. at 255. Western's motion for summary judgment as to Henderson's claim of discrimination based on his termination must therefore be denied.

### B. Henderson's Retaliation Claim

To state a *prima facie* case of retaliation under Title VII or the THRA, the plaintiff must show that (1) he engaged in protected activity; (2) Western knew that he had engaged in protected activity; (3) he suffered an adverse employment action; and (4) there was a causal connection between the termination and the exercise of protected rights. The fourth element, whether Henderson has established a causal connection between the protected activity and the adverse action, is the subject of dispute.

To satisfy the "causal connection" prong of a *prima facie* case, the plaintiff "must produce sufficient evidence from which an inference can be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity. *Allen v. Mich. Dep't of Corrections*, 165 F.3d 405, 413 (6th Cir. 1999). "Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Id.* Mere temporal proximity between the exercise of rights and an adverse action generally is not sufficient, in itself, to forge the necessary causal link. *See, e.g.*, *Hafford v. Seidner*, 183 F.3d 506, 515 (6th Cir. 1999) (two-to-five month lapse found to be only "loose temporal proximity," and hence "insufficient to create a triable issue"); *Cooper v. City of North Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986) (no causal link between filing of civil rights charge and plaintiff's discharge occurring four months

later). The Sixth Circuit apparently has reached the conclusion that temporal proximity alone may, under certain circumstances, be sufficient to establish the requisite causal connection, but in such cases the proximity in question must be quite close. *See, e.g.*, *Asmo v. Keane*, 471 F.3d 588, 593 (6th Cir. 2006) (where less than two months had passed between the time the employer learned the plaintiff was pregnant with twins and its decision to fire her as part of a reduction in force, temporal proximity alone was sufficient to supply the *Barnes* "additional evidence" of retaliation in the RIF context); *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (stating that "this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is *acutely near in time*, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise" (emphasis added)).

In this case, approximately eight months passed between the date of Henderson's first EEOC charge and his termination as part of a reduction in force. The Court finds that the passage of eight months, under the circumstances of this case and standing alone without more, would not be sufficient to establish the requisite causal connection. Henderson, however, also points out that he was paid less than at least two similarly situated white employees during the same time frame and, as discussed above, that Western's proffered reason for singling him out for termination as part of a reduction in force—that he was among the four least efficient employees—is not supported by any admissible evidence in the record. Western's failure in that regard both assists Henderson in establishing his *prima facie* case and means that Western has not met its burden of production in rebutting Henderson's *prima facie* case of retaliation. Because Western has not pointed to any admissible evidence in the record to support the proffered reasons for its decision to terminate Henderson, *see Burdine*, 450 U.S. at 255, its motion for summary judgment in its favor as to Henderson's retaliation claim must also fail.

## IV.     CONCLUSION

As set forth above, the Court finds that genuine issues of material fact preclude summary judgment in this case and that the defendant's motion must therefore be denied.

An appropriate Order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge